128 P.3d 920

**Louise E. CURTIS, Claimant–Appellant,**

v.

**M.H. KING COMPANY, Employer, and State Insurance Fund, Surety, Defendants–Respondents.**

No. 31353.

Supreme Court of Idaho, Boise, December 2005.

Dec. 30, 2005.

Rehearing Denied Jan. 27, 2006.

384

John F. Greenfield, PA, Boise, for appellant. John F. Greenfield argued.

Elam & Burke, P.A., Boise, for respondents. James A. Ford, argued.

BURDICK, Justice.

Louise Curtis (Curtis) appeals to this Court from a decision of the Idaho Industrial Commission finding that an industrial accident she suffered in 2001 (the 2001 accident) did not cause or aggravate avascular necrosis in her hip. The decision from which Curtis appeals upheld an earlier denial by the State Insurance Fund (SIF) of Curtis' claim for worker's compensation benefits. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Curtis was employed as a saleswoman at M.H. King, (King) a variety store in Eagle, Idaho. On June 11, 2001, she suffered an accident while she was moving merchandise off the sidewalk in front of the store. Curtis, who was 64 years old at the time of the accident, fell first to her buttocks, then flat on her back, striking the back of her head on the pavement. Complaining of pain in her neck and lower back, Curtis sought treatment first from a chiropractor, and later from W. Steven Rudd, M.D. (Dr. Rudd).

Dr. Rudd first examined Curtis in late July, 2001. That November, Dr. Rudd performed surgery on Curtis to remove a herniated disc from her back. In March, 2002, he released her to return to work with restrictions, and rated her injury at 10% of the whole-person partial permanent impairment. The following month, Curtis returned to Dr. Rudd complaining of pain in the left hip. After an x-ray and a bone-scan were conducted, Dr. Rudd diagnosed Curtis' condition as avascular necrosis in the left hip. Curtis scheduled hip replacement surgery with Dr. Rudd, but cancelled when she discovered Dr. Rudd was not a provider under her health insurance plan. Curtis' left hip replacement was performed in April 2003 by Dr. Colin Poole, M.D. (Dr. Poole).

Curtis filed a claim for benefits with the SIF, King's surety. In response to inquiries from the SIF, Dr. Rudd responded with a letter (the July 2002 letter) advising that Curtis' avascular necrosis was likely not a result of her 2001 accident. The SIF then denied Curtis' claim, echoing Dr. Rudd's assertion that her avascular necrosis was not attributable to the 2001 fall at work. Following this denial, Curtis brought a complaint against King and the SIF with the Idaho Industrial Commission which was heard by an Industrial Commission referee. The referee, after hearing extensive testimony and attending the deposition of Dr. Rudd, ruled in favor of King and the SIF. The referee's findings of fact and conclusions of law were subsequently adopted by the Industrial Commission, with one Commissioner dissenting without comment. Curtis then requested the Industrial Commission reconsider its earlier decision, but the request was denied. Curtis then filed a timely appeal from that order which is now before this Court.

## II. STANDARD OF REVIEW

When reviewing a decision of the Industrial Commission, this Court exercises free review over questions of law, but will uphold the factual findings of the Commission provided they are supported by substantial and competent evidence. *Uhl v. Ballard Medical Products, Inc.,* 138 Idaho 653, 657, 67 P.3d 1265, 1269 (2003). "Substantial and competent evidence is relevant evidence that a reasonable mind might accept to support a conclusion." *Id.* The conclusions reached by the Industrial Commission regarding the credibility and weight of evidence will not be disturbed unless the conclusions are clearly erroneous. *Hughen v. Highland Estates,* 137 Idaho 349, 351, 48 P.3d 1238, 1240 (2002). We will not re-weigh the evidence or consider whether we would have drawn a different conclusion from the evidence presented. *Id.*

## III. ANALYSIS

The damage to Curtis' back arising from her 2001 accident was treated as an industrial accident for which Curtis collected benefits under worker's compensation. However, the parties disagree whether Curtis' advanced avascular necrosis in her hip resulted from aggravation caused by that same 2001 accident, and consequently whether the condition can be traced to an industrial cause for which worker's compensation applies.

Testimony offered in the hearing before the Industrial Commission referee established that avascular necrosis is tissue death brought about by an interruption in the supply of blood. When it afflicts the joints, such as the shoulder and hips, it manifests itself as bone death. Sometimes the condition is caused by trauma, but it has also been linked to the use of steroids, the use of alcohol, and to some blood disorders. Often, the triggering mechanism cannot be discerned in individual cases. In that event, the avascular necrosis is termed as "idiopathic."

The Industrial Commission referee also found that once the condition has been triggered, it may progress or become dormant. Sometimes a case may remain dormant for the remainder of a patient's entire life. If the condition progresses, or if a dormant condition is retriggered, symptoms typically do not appear for six months to two years. This is because the body often takes months or years to react to the affliction, and the damage takes some time to become severe enough to induce pain. This opening stage of avascular necrosis has been referred to as the "quiescent period" that precedes more advanced—and painful—stages of the condition. When the hip is affected, avascular necrosis can progress to the point that the femoral head collapses in the joint.

In the present case, both parties agree that Curtis' avascular necrosis was initially the result of a fall she suffered in 1988. (The 1988 accident). The condition was not initially severe, and went into a dormant stage until approximately 2001 or 2002. The disagreement between the parties centers on whether Curtis' avascular necrosis re-emerged from dormancy because the condition was aggravated by the physical trauma of the 2001 accident or whether it was "idiopathic" and reemerged for no known reason.

In the Industrial Commission hearing, Dr. Poole, who performed Curtis' hip replacement surgery, offered his expert opinion suggesting that Curtis' avascular necrosis reemerged and ultimately required surgery because of aggravation caused by the 2001 accident. This opinion was supported by another expert witness, Samuel Chmell, M.D. The opposite opinion was voiced by Dr. Rudd, and supported by Michael Phillips, M.D. Dr. Rudd maintained that Curtis' avascular necrosis was most likely idiopathic.

### A. Dr. Rudd's Testimony Provided Substantial And Competent Evidence Supporting the Industrial Commission's Determination.

Curtis forthrightly acknowledges that under the standard of review applicable to this case, this Court will uphold the Industrial Commission's decision provided it is supported by substantial and competent evidence. Curtis maintains that in this instance the Industrial Commission's decision lacked such substantial and competent evidence because the Commission relied chiefly on flawed testimony presented by Dr. Rudd.

### 1. Dr. Rudd's Testimony Was Consistent.

The first flaw alleged in Dr. Rudd's testimony concerns what Curtis describes as a "switch" in Dr. Rudd's position midway through his deposition. In Curtis' view, Dr. Rudd in his July 2002 letter to the SIF first advanced a view that because Curtis did not complain to him of pain in her hip until near the end of the period that he was treating her—from approximately six weeks after the June 2001 accident until May 2002—she was not afflicted with advancing avascular necrosis during that time. That position, according to Curtis, was untenable because if Curtis' avascular necrosis was retriggered by the 2001 accident, the time during which Dr. Rudd was providing care would correspond to the "quiescent period" of the condition. As a result, rather than being evidence that Curtis' condition was idiopathic, the lack of hip pain during that period would be entirely consistent with Curtis' theory that the 2001 accident retriggered her avascular necrosis.

Curtis asserts her counsel confronted Dr. Rudd with this alleged problem in his testimony, and Dr. Rudd reacted by backtracking and changing his analysis. According to Curtis, Dr. Rudd spontaneously invented a new theory as to why the absence of reported hip pain was important. This allegedly new theory held that although the absence of hip pain *during the time Dr. Rudd was treating Curtis* was consistent with a developing case of avascular necrosis, if the condition had been retriggered by the 2001 accident there would have been hip pain associated with that accident—and if Curtis had suffered from such *past pain* she would have reported it to Dr. Rudd even if the pain had abated by the time he first examined her.

In his deposition testimony, Dr. Rudd explained that the human hip is robust, and only severe trauma is normally sufficient to induce avascular necrosis. Although Curtis' fall was hard enough to damage a disk in her back, Dr. Rudd offered that in his opinion Curtis' spine was already "badly degenerated" prior to her 2001 accident and prone to damage from even a low energy fall. According to Dr. Rudd, the degree of trauma necessary to retrigger the avascular necrosis in Curtis' hip would have also produced hip pain. Dr. Rudd acknowledged that any pain produced as a direct result of the trauma (as distinguished from much later pain associated with avascular necrosis when the condition became advanced) would likely have come and gone in the six weeks between the 2001 accident and Curtis' first appointment with Dr. Rudd. However, he testified that Curtis was thorough in describing the history of her injury and the timing and locations of the pain she suffered. Dr. Rudd maintained that if Curtis had suffered the kind of hip pain that would be associated with trauma sufficient to retrigger avascular necrosis in the hip, he was confident that she would have reported that pain—even weeks after the accident, and even if the hip pain had since ceased.

On appeal, Curtis argues that Dr. Rudd's expert opinion regarding her condition is valueless in part because of the sudden change in his analysis under cross-examination. Contrary to Curtis' argument, however, the position taken by Dr. Rudd in his July 2002 letter to the SIF is consistent with his later testimony. Dr. Rudd's July 2002 letter placed much emphasis on the absence of reported pain in Curtis' hip. Curtis asserts that Dr. Rudd erroneously believed that such hip pain would be perceived early in the development of avascular necrosis, and that by expecting such pain at that stage Dr. Rudd demonstrated ignorance of the nature of the condition. In his July 2002 letter, however, Dr. Rudd never expressed the view Curtis attributes to him. Instead, the letter stresses the significance of the absence of reported hip pain, but does not state *why* the absence of pain was significant. Curtis does not direct our attention to any point in the record, in the July 2002 letter or elsewhere, where Dr. Rudd describes the significance of the lack of hip pain in a way that is inconsistent with his testimony in the deposition. Instead, the record suggests that Dr. Rudd placed much weight on the absence of reported hip pain, but only in his deposition did he elaborate his reasoning as to why.

## 2. The Industrial Commission's Determination Regarding Dr. Rudd's Credibility is Not Overturned On Appeal.

■ Curtis argues that it was unreasonable for the Industrial Commission to have placed weight on Dr. Rudd's testimony because Dr. Rudd displayed evidence of bias. Curtis contends bias was demonstrated in Dr. Rudd's alleged switch in theories during his deposition. If contrary facts caused Dr. Rudd to simply change his justifications rather than reconsider his conclusion, argues Curtis, it suggests bias. Curtis also offers a list of other actions or statements by Dr. Rudd in which bias is allegedly shown. She sees bias in Dr. Rudd's statement that Curtis "embellished" her history; in Dr. Rudd's refutation of Dr. Poole's contrary opinion; in Dr. Rudd's refusal to agree that Curtis' 2001 accident resulted from a "hard" fall; in "refus[ing] to recognize that causation need only be proved to a reasonable medical probability;" in "demanding that the Claimant complain to him of an immediate hip pain that would have come and gone by the time he first saw her;" in trying to "debunk the evidence of serial x-rays;"[1] and in "constantly defending his positions despite the evidence, in long, narrative answers, and occasionally retreating from statements he made that he recognized as helping Claimant."

The difficulty with Curtis' argument on this point is that her allegation that Dr. Rudd was biased is an attack on his credibility as a witness. Determination of the credibility of a witness is a matter best left to the trier of fact. *Ross v. Tupperware Mfg. Co./Premark,* 122 Idaho 641, 643, 837 P.2d 316, 318 (1992). The trier of fact, who has the opportunity to observe the witnesses and form judgments from their demeanor, is uniquely positioned to determine their credibility. *Hoskinson v. Hoskinson,* 139 Idaho 448, 456, 80 P.3d 1049, 1057 (2003). Here, the Industrial Commission referee, in a decision adopted by the Commission, specifically found Dr. Rudd to

be a credible witness. This referee took the additional step of actually attending Dr. Rudd's post hearing deposition. This buttresses his decision on Dr. Rudd's credibility. This Court defers to the referee's creditability determination and the weight given Dr. Rudd's testimony by the Commission.

## B. The Industrial Commission Did Not Apply An Improper Standard Of Proof.

■ Curtis argues that the Industrial Commission misapplied the rules of evidence and misstated the claimant's burden. Idaho law requires a worker's compensation claimant to demonstrate to a "reasonable degree of medical probability" that her condition was the result of a compensable accident or occupational disease. *Bowman v. Twin Falls Const. Co.,* 99 Idaho 312, 317, 581 P.2d 770, 775 (1978). Curtis contends that the Industrial Commission improperly concluded that because Curtis could not prove precisely how her fall compromised the blood supply to her hip, she could not carry her burden to show to a reasonable degree of medical probability that the aggravation of her avascular necrosis was caused by her 2001 accident. She also disagrees with the Industrial Commission's rejection of her assertion that the lower back pain she suffered might have also included hip pain that she mistook to be lower back pain, or that the lower back pain might have masked hip pain.

Curtis alleges that the Industrial Commission improperly based its decision on only those two points; (1) the allegation that the Industrial Commission required her to show precisely how her 2001 accident aggravated her avascular necrosis, and (2) the rejection of her assertion regarding confusion between lower back pain and hip pain. Following from that allegation, Curtis contends that the Industrial Commission erred in basing its decision on such narrow grounds. This, she argues, is because the circumstantial case she assembled should be viewed as a whole,

---

1. Two x-rays, one taken in 2001 and the other in 2002, appeared to show that Curtis' avascular necrosis advanced rapidly during that time. Dr. Rudd questioned the quality of the first x-ray because it was aimed to show Curtis' lower spine and incidentally provided an imperfect image of

her left hip. However, the conclusion that Curtis draws from the two x-rays—that her avascular necrosis advanced significantly during the time between the two images—is compatible with the facts as presented by both parties and was not contested.

and not rejected simply because two parts of the larger case have been found wanting.

This caricature Curtis presents of the Industrial Commission's decision does not, however, resemble the actual decision itself. The decision did not impose any requirement that Curtis prove the precise mechanism by which her avascular necrosis was retriggered. The Industrial Commission did express skepticism regarding Curtis' theory that she suffered hip pain that was masked by, or mistaken for, lower back pain. But it did not issue its ruling on such narrow grounds. Instead, the Industrial Commission's decision held that "[t]he weight of medical records and opinions show Claimant's avascular necrosis was probably not caused or accelerated by the [2001] industrial accident."

This Court does not re-weigh the evidence on appeal, nor do we consider whether it would have reached a different conclusion than the Industrial Commission from the evidence presented. *Hughen*, 137 Idaho at 351, 48 P.3d at 1240. This Court has read and analyzed the record very closely and as a result rules the Commission's decision reflects that it weighed the evidence and credibility of the witnesses and reached its conclusions accordingly.

## C. The Industrial Commission Did Not Abuse Its Discretion By Denying Curtis' Motion For Reconsideration.

Following the Industrial Commission's adoption of the referee's decision, Curtis moved for reconsideration of that decision. The Industrial Commission then appeared to deny this request with an "Order Denying Reconsideration." Curtis asserts that in denying her motion, the Industrial Commission abused its discretion under I.C. § 72–718 and I.C. § 72–732(2).

■ The first statute to which Curtis refers provides in relevant part that "any party *may move* for reconsideration or rehearing" of a decision. I.C. § 72–718 (emphasis added). The statute permitting a party to request reconsideration or rehearing does not obligate the Commission to *grant* such requests. *See id.* In that sense, the statute functions similarly to I.R.C.P. 11(a)(2)(B) and

I.R.C.P. 7(b)(3)(D) which provide for motions for reconsideration without mandating that such requests be granted. The second statute to which Curtis cites, I.C. § 72–732(2), provides that this Court may set aside an order or award of the Industrial Commission if "[t]he commission has acted without jurisdiction or in excess of its powers." Curtis has not, however, pointed to any authority suggesting that declining to grant her motion for reconsideration exceeded the powers of the Industrial Commission and in fact, Curtis' argument is actually one that the Commission has failed to act *within* its jurisdiction.

■ It is axiomatic that a claimant must present to the Commission new reasons factually and legally to support a hearing on her Motion for Rehearing/Reconsideration rather than rehashing evidence previously presented. Although Curtis presented a very detailed brief in support of her motion she did not produce new law or evidence to necessitate a rehearing or reconsideration.

There is no support for Curtis' assertion that the Industrial Commission abused its discretion in denying her motion for reconsideration.

## D. Attorney Fees

■ The Defendants request an award of attorney fees on appeal pursuant to I.A.R. 41(a) and I.C. § 12–121. Idaho Appellate Rule 41 provides a procedure for requesting attorney fees on appeal, but is not authority alone for awarding fees. *Shawver v. Huckleberry Estates*, 140 Idaho 354, 365, 93 P.3d 685, 696 (2004). Idaho Code § 12–121 permits an award of attorney fees in a civil action to the prevailing party if the court determines the case was brought, pursued or defended frivolously, unreasonably or without foundation. *Mutual of Enumclaw Ins. Co. v. Pedersen*, 133 Idaho 135, 139, 983 P.2d 208, 212 (1999). The statute in question does not, however, provide authority for an award of attorney fees on appeals from administrative agency rulings. *Northwest Pipeline Corp. v. State Dept. of Employment*, 129 Idaho 548, 550–51, 928 P.2d 898, 900–01 (1996). Because the present action comes to this Court on an appeal from the Industrial

Commission, the Defendants cannot be granted attorney fees on appeal pursuant to I.C. § 12–121.

## IV. CONCLUSION

The Industrial Commission's decision in this case was based upon substantial and competent evidence, including medical records and expert testimony such as that offered by Dr. Rudd. The conclusions reached by the Industrial Commission regarding the credibility and weight of evidence will not be disturbed on appeal unless the conclusions are clearly erroneous. *Hughen,* 137 Idaho at 351, 48 P.3d at 1240. This Court affirms the decision of the Industrial Commission. Costs, but not attorney fees on appeal, are awarded to the Defendants.

Chief Justice SCHROEDER and Justices TROUT, EISMANN and JONES concur.

